IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | |
|---|---|
| DANIELLE HUNTER and BRADFORD MEREDITH, | * * * |
| Plaintiffs, | * * |
| vs. | * No. 4:05cv001908 SWW * * * |
| BRUCE OAKLEY, INC., | * * |
| Defendant. | * |

## MEMORANDUM AND ORDER

This is an action alleging employment discrimination and is brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. Plaintiff Danielle Hunter ("Hunter"), who is white, claims she was terminated from her employment with defendant, Bruce Oakley, Inc. ("Oakley"), because she is married to an African-American and has bi-racial children. Plaintiff Bradford Meredith ("Meredith"), who also is white, claims he was terminated from his employment with Oakley because of his race and for dating Hunter, who was married to an African-American and who has bi-racial children. The matter is before the Court on motion of Oakley for summary judgment [doc.#50] to which plaintiffs have responded in opposition. Having considered the matter, the Court grants Oakley's motion for summary judgment.

I.

Hunter was hired by Oakley, a transportation company located in North Little Rock,

Arkansas, in 2001. During Hunter's employment with Oakley, she had one bi-racial child and an African-American husband. Oakley was aware of the fact that Hunter had a bi-racial child and was married to an African-American during her employment as Hunter, among other things, had photos of her child at her desk and shared these photos with other employees, her husband picked her up from work occasionally, and Hunter, her husband, and their child attended an Oakley company Christmas party.[1]

Hunter voluntarily left her employment with Oakley because she was ill with a difficult second pregnancy which rendered her unable to work. Hunter subsequently applied to work for Oakley a second time and was re-hired by Oakley on February 6, 2005, as a payroll billing clerk. Hunter now had two bi-racial children and remained married to the same African-American. During Hunter's second employment with Oakley, Oakley was aware that Hunter had two bi-racial children and an African-American husband as Hunter again kept pictures of her children on her desk, her husband picked her up from work from time to time, and Hunter brought one of her children to Oakley just prior to her being rehired.[2]

Meredith was hired by Oakley in April 1997 to work in its shop and was promoted to recruiter in August 2000. In his capacity as recruiter, Meredith was in charge of training independent contractors that hire on as drivers for Oakley.

Tommy Mitchell ("Mitchell") was Hunter's supervisor and Benny Weatherford

---

[1] Hunter states in her response to Oakley's statement of material facts that she does not dispute that Oakley was aware she had an African-American husband and bi-racial children. In this respect, Hunter states she does not dispute that she, along with her African-American husband and first bi-racial child, attended an Oakley Christmas party. In her affidavit attached to her response to Oakley's motion for summary judgment, however, Hunter states that she never attended a company Christmas party or any work related gathering. Hunter cannot, of course, create factual disputes with her own conflicting assertions.

[2] Again, Hunter acknowledges that her co-workers and supervisors were aware that she had an African-American husband and bi-racial children.

("Weatherford") was Vice-President of Oakley Trucking who was the direct employer of Hunter. In approximately June or July 2005, Weatherford states he heard from Mitchell that there were rumors about Hunter and Meredith dating, which, according to Oakley, was in violation of a long-standing non-fraternization policy Oakley states it maintained. Weatherford states he confronted Meredith about the rumor, warning Meredith that he could lose his job, and that Meredith denied he and Hunter were dating. Weatherford states that approximately a month later, Jeremy Kellett ("Kellett"), Meredith's supervisor, told him that Colby Foster, an employee of Oakley, had learned from Hunter at a bar that she and Meredith were dating. Kellett relayed this information to Weatherford who, "tired of the rumors," terminated Meredith and instructed Mitchell to terminate Hunter. Both plaintiffs were terminated on August 19, 2005.

Hunter states she feels she was terminated due to her association with Meredith and also because she has bi-racial children but that the "stronger" reason was that she has bi-racial children. Hunter states she was only friends with Meredith when she worked at Oakley and "not seriously" involved with Meredith at that time – that they "talked on the phone, went out to dinner, hung out with friends, other people from Oakley." She also states she was driving Meredith's truck at that time, stating she borrowed it to move.[3] Hunter states her and Meredith's friendship turned into something serious a month after they were terminated from Oakely and that she and Meredith now live together, have a child together, and she is in the process of divorcing her husband.

---

[3] According to Adam McQueen ("McQueen"), a third-party computer consultant who does work at Oakley, Hunter requested that he delete emails between her and Meredith from the Oakley email archives. McQueen reported this to Mitchell. Hunter, however, states she asked McQueen to delete all inter-office emails, not just the ones involving Meredith, as she had learned that employees of Oakley could get into trouble if they were emailing each other about personal issues or things that did not pertain to work.

In contrast, Meredith states in his charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC") that he was terminated because of his race and his "association for dating a white female that has bi-racial children ... [and] ... the white female that I was dating was also terminated." Meredith declared under penalty of perjury that his EEOC charge was true and correct. In his deposition, however, Meredith states that the EEOC charge was inaccurate in stating he was dating a white female – Hunter – and should have stated that he was terminated for *rumors* that he was dating a white female employee.[4]

Both Hunter and Meredith generally deny knowledge of a non-fraternization policy maintained by Oakley that would cover employees such as themselves but state that if such a policy was in effect, it was not in writing. In any case, Hunter acknowledges that Colby Foster[5] told her "a few days before" her termination about Oakley's non-fraternization policy, and she states she expressed concern about the non-fraternization policy to fellow employee Carolyn Jones. She also states she and Meredith talked about a non-fraternization policy. Meredith, in turn, acknowledges there was a written policy prohibiting Oakley employees and independent contractors from dating but states that any non-fraternization policy between Oakley employees was not in the company handbook and that he "had zero knowledge that interoffice relationships were forbidden during [his] employment." Neither Hunter nor Meredith deny that Oakley had such a policy, however, even if it was unwritten.

Included in the record are depositions of several current and former Oakley employees – Tiffany Watson; Andrew Simpson; Cheri Kyzer; Scott Dowden; Carolyn Jones; Patricia Yvonne

---

[4] As with Hunter, Meredith cannot create a factual dispute with his own conflicting assertions.

[5] The transcript of Hunter's deposition on this point references "Toby" Foster but "Toby" and Colby" Foster apparently are the same individual.

4

Randall; Mike Randall; and Cecilia Owens Synco – who acknowledged their having dated certain co-employees and who professed to hearing rumors of other co-employees dating each other. However, none of these employees, most of whom acknowledged knowing that dating co-employees was against Oakley policy, could state that management knew of any such dating. For their part, Hunter claims that any rumors she heard of employees of Oakley dating each other were only hearsay, while Meredith likewise states he has no personal knowledge of any relationship between two employees of Oakley, only having heard rumors of such relationships.

II.

Oakley moves for summary judgment on grounds (among others) that plaintiffs cannot establish a prima facie case of discrimination and that even if they could, they cannot show that the legitimate, nondiscriminatory reason given by Oakley for plaintiffs' termination – violation of Oakley's long-standing non-fraternization policy – was pretextual. Oakley argues there are no genuine issues of material fact with respect to these issues and that it is entitled to summary judgment as a matter of law.

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

B.

Because no direct evidence supports plaintiffs' Title VII and § 1981 race discrimination claims, this Court, as do the parties, analyzes their claims under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007); *Arnold v. Nursing and Rehabilitation Center at Good Shepherd, LLC*, 471 F.3d 843, 846 (8th Cir. 2006).[6] The first prong of the *McDonnell Douglas*

---

[6] Direct evidence is evidence that establishes a specific link between the alleged discriminatory animus and the challenged action, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision. *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (internal quotation marks and citations omitted). Direct evidence includes evidence of conduct or statements by persons involved in the decisionmaking process that may be

6

scheme requires a plaintiff to present a prima facie case of discrimination. *Carpenter*, 481 F.3d at 616 (citing *McDonnell Douglas*, 411 U.S. at 802). To meet their burden of showing a prima facie case of race discrimination, plaintiffs must show (1) they were members of a protected class, (2) they were meeting their employer's legitimate job expectations, (3) they suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated differently. *Id.* (internal quotation marks and citation omitted). The establishment of a prima facie case creates a presumption of unlawful discrimination, which in turn requires a defendant to come forward with evidence of a legitimate, nondiscriminatory reason for the defendant's actions. *McGinnis v. Union Pacific Railroad*, 496 F.3d 868, 873 (8th Cir. 2007). If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual. *Id.*

a.

The Court first briefly addresses whether plaintiffs are members of a protected class. Oakley essentially concedes that Hunter, being married to an African-American and with bi-racial children, is a member of a protected class (although it claims somewhat cryptically that the issue is moot). *See, e.g., Chandler v. Fast Lane, Inc.*, 868 F.Supp. 1138, 1143-44 (E.D.Ark. 1994) ("A white person's right to associate with African-Americans is protected by § 1981" and "an employer's implementation of an employment practice that impinges upon this right is actionable under Title VII"). As for Meredith's claim that he is a member of a protected class,

---

viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor. *Id.*

the Court agrees with Oakley that "[t]he argument that Plaintiff Meredith is a member of a protected class because he is dating someone who has an African-American husband and two bi-racial children is weak ..." and that "Meredith is stretching his claim far outside the boundaries of any plausible connection between his termination and racial discrimination." The Court need not decide this issue, however, because even if plaintiffs are members of a protected class and there are no mootness issues, Oakley still is entitled to summary judgment for the failure of plaintiffs to establish a prima facie case of discrimination. Accordingly, the Court assumes for purposes of today's decision only that plaintiffs are members of a protected class. As there is no dispute that plaintiffs were meeting their employer's legitimate job expectations and suffered an adverse employment action, the Court turns to the fourth element of a prima facie case – whether similarly situated employees outside the protected class were treated differently. This requires evidence that plaintiffs and the white employees were involved in or accused of the same or similar conduct and were disciplined in different ways. *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005).[7]

b.

Plaintiffs contend that similarly situated white employees were treated more favorably in that they were dating or rumored to be dating co-employees but were not terminated. Plaintiffs, however, have not demonstrated that Weatherford, Mitchell and/or Kellett were aware of such

---

[7] For purposes of establishing a prima facie case of disparate treatment, the Eighth Circuit in *Rodgers* adopted a "low-threshold" standard for determining whether employees are similarly situated as the burden of establishing a prima facie case of disparate treatment is not onerous. 417 F.3d at 852-53. At the pretext stage, however, the test for determining whether employees are similarly situated is a "rigorous" one. *Id.* at 853. *But Cf. Fields v. Shelter Mutual Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (adopting "rigorous" test at prima facie stage).

dating or rumors of dating and plaintiffs thus have not demonstrated disparate treatment in the manner in which they and other employees of Oakley were treated.[8]  Moreover, plaintiffs do not dispute Oakley's claim that several of its employees have bi-racial children and have not been terminated but merely state they do not have sufficient information or knowledge to dispute that fact.[9]

While it may be true, as plaintiffs claim, that they were not been in a relationship with each other while employed at Oakley, Oakley obviously came to the conclusion that they were and that this relationship was a violation of its non-fraternization policy.  Even if this conclusion was incorrect, the employment discrimination laws under which plaintiffs bring this action prohibit intentional discrimination based on certain, discrete classifications; they do not prohibit employment decisions based on other facts, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices.  *Rose-Matson v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (citation omitted).  *See also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) (noting that a proffered legitimate, nondiscriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination).  A plaintiff must do more than simply discredit an employer's nondiscriminatory explanation; he must also present evidence capable of proving that the real reason for his termination was discrimination based on race.  *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 801 (8th Cir. 1994) (internal quotation marks and citation

---

[8] Former Oakley employee Patricia Yvonne Randall, who was supervised by Mitchell, states she was terminated for dating a co-employee.

[9] Former Oakley employee Mike Randall stated "there's a bunch of people" at Oakley, including himself, who have bi-racial children.

omitted). Here, plaintiffs have presented no evidence from which it could reasonably be determined that Oakley terminated them because of their race and because Hunter had an African-American husband and bi-racial children. Moreover, "[t]here is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time." *Herr v. Airborne Freight Corp.*, 130 F.3d 359, 362-63 (8th Cir. 1997); *see also Lowe v. J.B. Hunt Transp.*, 963 F.2d 173, 175 (8th Cir. 1992) (holding in an age discrimination case that "[i]t is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that company officials that hired him at age fifty-one had suddenly developed an aversion to older people less than two years later."). Here, it is likewise incredible, in light of the particular weakness of plaintiffs' evidence otherwise, to believe that Oakley, which rehired Hunter following her earlier voluntary resignation, somehow developed an aversion to Hunter's African-American husband and bi-racial children (and, by extension, Meredith's association with Hunter) and terminated plaintiffs' employment knowing, both before Hunter's voluntary resignation and at the time of her rehire, that she had an African-American husband and bi-racial children.

c.

Even had plaintiffs established a prima facie case of discrimination, plaintiffs have not identified any employees and their circumstances from which one could find that they and the disparately treated employees were similarly situated in all relevant respects, and plaintiffs accordingly have not demonstrated that Oakley's stated legitimate and non-discriminatory reason

for their termination is pretextual.[10]

III.

For the foregoing reasons, the Court grants Oakley's motion for summary judgment [doc.#50]. Judgment will be entered accordingly.

IT IS SO ORDERED this 22nd day of September 2008.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[10] Where a pretext argument is based on comparisons of employees, a plaintiff must show that employees are similarly situated in all relevant aspects. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994). The test to determine whether employees are "similarly situated" to warrant a comparison to plaintiffs is, as previously noted, a "rigorous" one. *Id. See also Rodgers*, 417 F.3d at 853; *Equal Employment Opportunity Commission v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003). "'Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects.'" *Id.* at 775-76 (quoting *Lynn v. Deaconess Medical Ctr.-West Campus*, 160 F.3d 484, 487 (8th Cir. 1998)). "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* at 776. To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness. *Id. See also Rodgers*, 417 F.3d at 853.